**Affirmed and Opinion filed December 22, 2015.**



In the

# Fourteenth Court of Appeals

### NO. 14-14-00754-CV

**ANDRE MCCOY, AS PERMANENT GUARDIAN OF SHANNON MILES MCCOY, AN INCAPACITATED PERSON, Appellant**

**V.**

**FEMPARTNERS, INC., FEMPARTNERS OF CENTRAL HOUSTON, L.P. F/K/A OGA MANAGEMENT PARTNERSHIP, L.P., NEW OGA, INC., PROASSURANCE CORPORATION, AMERICAN PHYSICIANS SERVICE GROUP, INC., AND AMERICAN PHYSICIANS SERVICE GROUP, INC. F/K/A AMERICAN PHYSICIANS INSURANCE COMPANY F/K/A AMERICAN PHYSICIANS INSURANCE EXCHANGE, Appellees**

On Appeal from the Probate Court No. 2
Harris County, Texas
Trial Court Cause No. 352,923-404

## O P I N I O N

Appellant Andre McCoy brought a healthcare liability claim on his incapacitated wife Shannon's behalf against Dr. Debra Gunn, Obstetrical and

Gynecological Associates, P.A., and Obstetrical and Gynecological Associates, P.L.L.C. The jury found in McCoy's favor, and the trial court issued its judgment. McCoy then named various corporate entities as additional defendants. These corporate entities are appellees FemPartners, Inc., FemPartners of Central Houston, L.P. f/k/a OGA Management Partnership, L.P., and New OGA, Inc., as well as ProAssurance Corporation, American Physicians Services Group, Inc., and American Physicians Services Group, Inc. f/k/a American Physicians Insurance Company f/k/a American Physicians Insurance Exchange. McCoy alleged that these entities were responsible for the conduct of Obstetrical and Gynecological Associates, P.A. because they used it as a means of circumventing a statute, and holding only Obstetrical and Gynecological Associates, P.A. responsible would result in injustice. The trial court severed this cause from the underlying medical negligence claim. The FemPartners entities and the ProAssurance entities moved for summary judgment. The trial court granted final summary judgment in their favor. We affirm.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

In July 2006, Andre McCoy, as permanent guardian for his wife Shannon, filed suit against various entities, including Dr. Debra Gunn and Obstetrical and Gynecological Associates, P.A. (OGA, P.A.), for medical negligence related to Shannon's September 2004 labor and delivery. McCoy later added Obstetrical and Gynecological Associates, P.L.L.C. (OGA, P.L.L.C.), the successor entity to OGA, P.A., as a defendant. McCoy alleged that Gunn committed medical negligence and that her employer OGA, P.A. was vicariously liable pursuant to respondeat superior. In November 2011, the case proceeded to trial, and the jury returned its verdict in favor of McCoy. The trial court found that OGA, P.A. was vicariously liable for Gunn's negligence and issued its final judgment based on the jury's

2

verdict.

In March 2012, McCoy named FemPartners, Inc., FemPartners of Central Houston, L.P. f/k/a OGA Management Partnership, L.P., and New OGA, Inc.[1] as defendants, alleging that the FemPartners entities were "vicariously responsible and/or jointly and severally responsible for the conduct of the employees, members and/or agents of Defendant" OGA, P.A. In April 2013, McCoy also named ProAssurance Corporation, American Physicians Services Group, Inc., and American Physicians Services Group, Inc. f/k/a American Physicians Insurance Company f/k/a American Physicians Insurance Exchange[2] as defendants, alleging that the ProAssurance entities were "vicariously liable and/or jointly and severally responsible for the liabilities of" the FemPartners entities. McCoy alleged that the FemPartners entities and the ProAssurance entities used OGA, P.A. "as a means of circumventing a statute, and holding only [OGA, P.A.] responsible would result in injustice." The statute at issue is the Texas Medical Practice Act.

In November 2013, the trial court severed the underlying medical negligence claims from the veil-piercing claims. McCoy moved for summary judgment, and the FemPartners entities and the ProAssurance entities responded. The trial court denied McCoy's motion.[3] The FemPartners entities and the ProAssurance entities also moved for summary judgment, and McCoy responded. The evidence included: the October 1997 Service Agreement entered into between OGA, P.A. and OGA Management Partnership; the January 2001 Amended and Restated Service Agreement entered into between OGA, P.A. and FemPartners of Central

---

[1] We refer to these defendants collectively as the FemPartners entities. New OGA, Inc. and FemPartners of Central Houston, L.P. are wholly owned subsidiaries of FemPartners, Inc.

[2] We refer to these defendants collectively as the ProAssurance entities.

[3] On appeal, McCoy does not challenge the trial court's denial of his motion for summary judgment.

3

Houston, L.P.; deposition testimony of Dr. John Irwin, President of OGA, P.A.; deposition and affidavit testimony of Jack Thompson, President and CEO of FemPartners, Inc.; hearing[4] testimony of Karen Nicolaou, CFO of OGA, P.L.L.C.; and deposition testimony of Danguole Spakevicius, former President and CEO of FemPartners, Inc.

The FemPartners entities based their traditional motion for summary judgment on the following grounds: (1) McCoy's action is time barred; (2) McCoy cannot raise a fact issue for purposes of veil-piercing because the FemPartners entities have no ownership interest in and could not have used OGA, P.A. to circumvent the Texas Medical Practice Act; (3) trying the veil-piercing claim without the underlying medical negligence claim violates due process and results in a void judgment; (4) trying the veil-piercing claim apart from liability violates the rule against bifurcation and requires a new trial of all claims against all defendants; (5) McCoy cannot raise a fact issue on the injustice element of veil-piercing based on circumvention of a statute and cannot plead any other grounds for veil-piercing; and (6) there can be no injustice in light of the rule that a plaintiff must give equity to receive equity.

The ProAssurance entities filed a hybrid motion for summary judgment. They based their traditional motion for summary judgment on the following grounds: (1) McCoy's action is barred by limitations; (2) because neither the FemPartners entities nor the ProAssurance entities possessed an ownership interest in OGA, P.A., they cannot be held vicariously liable for OGA, P.A.'s debts; (3) section 21.223 of the Texas Business Code conclusively bars a vicarious-liability

---

[4] The record indicates that in March 2013, after additional counsel entered the underlying medical negligence case on behalf of OGA, P.A. and OGA, P.L.L.C., the trial court held a hearing on Gunn's motion to show authority and OGA, P.A.'s and OGA, P.L.L.C.'s motion to disqualify counsel. Nicolaou testified at this hearing.

finding against the ProAssurance entities; and (4) McCoy's theory of vicarious liability is not available after trial of the underlying case. The ProAssurance defendants further argued that even if the trial court determined that the FemPartners entities were using OGA, P.A. to circumvent the statutory prohibition against the corporate practice of medicine, McCoy provided no evidence that he can pierce both the corporate veils of OGA, P.A. and of the FemPartners entities. The ProAssurance entities also incorporated the FemPartners entities' summary judgment motion.

After a hearing, the trial court granted the FemPartners entities' and the ProAssurance entities' motions for summary judgment without specifying the basis for its decision. McCoy timely appealed. In two issues, McCoy argues that the trial court erred in granting summary judgment in favor of the FemPartners entities and the ProAssurance entities.

## II. ANALYSIS

### A. Standard of review

Traditional summary judgment is appropriate under rule 166a(c) where a movant establishes that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). If the movant produces evidence entitling him to summary judgment, the burden shifts to the nonmovant to present evidence sufficient to raise a fact issue. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996). The evidence raises a fact issue if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary judgment evidence. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment

5

on that claim.  *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010).

Under rule 166a(i), a party may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial.   Tex. R. Civ. P. 166a(i).  Unless the nonmovant produces summary judgment evidence raising a genuine issue of material fact, the trial court must grant the motion.  *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207 (Tex. 2002) (citing rule 166a(i)).

We review a trial court's summary judgment de novo.  *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).  We take all evidence favorable to the nonmovant as true and indulge every reasonable inference and resolve any doubts in his favor.  *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).  Where, as here, the trial court's order granting summary judgment does not specify the grounds upon which it was granted, we must affirm the judgment if any of the theories advanced are meritorious.  *See W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).  We usually address no-evidence grounds first, but need not review them if we conclude we must affirm the ruling on traditional grounds.  *Wilkinson v. USAA Fed. Sav. Bank Trust Servs.*, No. 14–13–00111–CV, 2014 WL 3002400, at *5 (Tex. App.—Houston [14th Dist.] Jul. 1, 2014, pet. denied) (mem. op.).

Here, we focus our analysis on ground (2) of the FemPartners entities' motion, which we conclude is dispositive.  Even taking the facts and inferences in McCoy's favor, the FemPartners entities, and accordingly, the ProAssurance entities, have conclusively shown there is no genuine issue of material fact that they used OGA, P.A. to circumvent the corporate practice of medicine and they are entitled to judgment as a matter of law.

6

## B. Applicable law

The Texas Supreme Court has recognized that one basis for disregarding the corporate fiction for purposes of liability is "where the corporate fiction is used to circumvent a statute." *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986). The statute allegedly circumvented by the FemPartners entities and the ProAssurance entities here is the Texas Medical Practice Act. The Act prohibits physicians from "directly or indirectly aid[ing] or abet[ting] the practice of medicine by a person, partnership, association, or corporation that is not licensed to practice medicine by the board." Tex. Occ. Code Ann. § 164.052(a)(17) (West 2012 & Supp. 2015). "Practicing medicine" under the Act:

> means the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who:
>
> (A)  publicly professes to be a physician or surgeon; or
>
> (B)  directly or indirectly charges money or other compensation for those services.

Tex. Occ. Code Ann. § 151.002(a)(13) (West 2012 & Supp. 2015). "The purpose of [the Act] is to preserve the vitally important doctor-patient relationship and prevent possible abuses resulting from lay control of corporations employing licensed physicians to practice medicine." *Gupta v. E. Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 752 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); *see Fite v. Emtel, Inc.*, No. 01-07-00273-CV, 2008 WL 4427676, at *6 (Tex. App.—Houston [1st Dist.] Oct. 2, 2008) (mem. op.) (quoting *Gupta*, 140 S.W.3d at 752); *see also Flynn Bros., Inc. v. First Med. Assocs.*, 715 S.W.2d 782, 785 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) ("[W]hen a corporation comprised of lay persons employs licensed physicians to treat patients and the corporation receives the fee, the

corporation is unlawfully engaged in the practice of medicine.").

McCoy alleges that the FemPartners entities and the ProAssurance entities used the corporate fiction of OGA, P.A. to circumvent the statutory prohibition against the corporate practice of medicine within the Texas Medical Practice Act. Specifically, McCoy argues that the FemPartners entities "owned and controlled OGA, P.A. for purposes of doing indirectly what they could not do directly under the Medical Practice Act."

No prior case has considered the Act in the instant veil-piercing context. Prior cases generally have addressed whether a particular agreement or relationship between a physician, or a professional association of physicians, and a nonphysician individual, or a nonphysician corporate entity, was void or improper because it permitted the nonphysician entity to practice medicine in violation of the Act. These cases yielded a test amounting to whether the nonphysician entity in effect employed the physician.

In this veil-piercing context, we must determine whether the nonphysician corporate FemPartners entities were exercising sufficient control over the medical practice of the OGA, P.A. physicians such that the FemPartners entities were able to circumvent the prohibition against the corporate practice of medicine. Here, such an abuse of the corporate fiction arguably would allow the FemPartners entities to be held accountable for any underlying medical negligence of OGA, P.A.'s physician Gunn. Because prior cases have considered the level of control the nonphysician entity exercised over the physician, we find them useful and consider them in our analysis.

In *Gupta*, this court considered whether a joint venture agreement entered into between the appellant physician Gupta and corporate entity Northwest, which later was consolidated with Gamma Management into appellee Eastern Idaho

Tumor Institute (EITI), was unenforceable because it allowed the corporate practice of medicine in violation of the Act. 140 S.W.3d at 751. We considered relevant portions of the agreement, including that, under the joint venture formed to provide radiation therapy to cancer patients, Gupta would provide and be solely responsible for the payment of professional, medical, and administrative staffing and Northwest would contribute equipment, office space, and machinery. *Id.* at 753. With regard to income and loss, the parties agreed that gross revenue would be divided equally in half; all billings, collections, and accounts payable would be handled by Gamma; a bank account would be opened by Gamma for the joint venture; and any billing performed by Gupta required advance notice and would be at the direction or supervision of Northwest or Gamma. *Id.* Gupta had the authority to hire and fire his medical staff, and EITI could not trade or commercialize on Gupta's license. *Id.* at 754.

Gupta relied on *Flynn Brothers*, which we distinguished. *Gupta*, 140 S.W.3d at 753–54. In *Flynn Brothers*, under the arrangement between nonphysician appellants and physician corporate entity FMA, appellants acted as FMA's exclusive management agent with the rights to collect 66.67% of the profits, to trade and commercialize on the physician's license to get contracts to provide emergency medical care, and to select the medical staff to work in the hospitals under contract. *Gupta*, 140 S.W.3d at 753 (citing *Flynn Bros.*, 715 S.W.2d at 783, 785). The *Flynn Brothers* court concluded that the design, effect, and purpose of the agreement contravened the Act and was unenforceable where the amount of control appellants exercised over FMA rendered the relationship closer to employer-employee than business partners. *Gupta*, 140 S.W.3d at 753–55 (citing *Flynn Bros.*, 715 S.W.2d at 785).

The *Gupta* court also distinguished two cases in which appellate courts

9

determined that revocation of the appellant physicians' licenses was justified because their actions permitted another to use those licenses to practice medicine in contravention of the Act. *Id.* at 754 (discussing *Watt v. Tex. State Bd. of Med. Exam'rs*, 303 S.W.2d 884, 887 (Tex. Civ. App.—Dallas 1957, writ ref'd), and *Rockett v. Tex. State Bd. of Med. Exam'rs*, 287 S.W.2d 190, 191 (Tex. Civ. App.—San Antonio 1956, writ ref'd n.r.e.)). In both *Watt* and *Rockett*, the physicians worked for a clinic run by nonphysicians and were paid a set salary, and the clinics charged and collected all fees and could fire the physicians as they saw fit. *Watt*, 303 S.W.2d at 887; *Rockett*, 287 S.W.2d at 191. In *Watt*, the clinic also handled the physician's advertising. 303 S.W.2d at 886. As in *Flynn Brothers*, the relationships in *Watt* and *Rockett* in effect were that of employer-employee such that the courts determined the physician's actions permitted another to use his license to practice medicine for the purpose of treating or offering to treat patients in contravention of the Act. *Gupta*, 140 S.W.3d at 754.

In contrast, we found analogous *Woodson v. Scott & White Hospital*, 186 S.W.2d 720 (Tex. Civ. App.—Austin 1945, writ ref'd w.o.m.). *Gupta*, 140 S.W.3d at 754–55. In *Woodson*, the contract at issue was between a physician and corporate entity Temple Sanitarium, wherein Temple conveyed property to the physician who agreed to build a hospital. 186 S.W.2d at 721. Both the physician and Temple would occupy the building; Temple would refer patients to the physician and reimburse him for 25% of the cost of the land and the building; and Temple was entitled to 25% of the physician's net income and could exercise an option to purchase the physician's interest in the hospital when the contract expired. *Id.* An amended contract gave Scott & White Hospital (formerly, Temple) a one-third interest in the physician's practice. *Id.* After he passed away, the contract continued with the physician's sons. *Id.* Scott & White gave notice of

10

its intent to purchase the physicians' interest, and appellant physician refused to comply, arguing that the contract was illegal and void because it allowed a private corporation to engage in the practice of medicine. *Id.* at 721, 724. The *Woodson* court held the contract enforceable because the physicians' relationship with Scott & White was more in the nature of an independent contractor than an employee or agent. *Id.* at 725. Splitting of gross revenues amounted to payment of rent and compensation for referrals. *Id.* The court particularly considered that the physicians were "entirely independent" as to the diagnosis and treatment of patients and "accepted full responsibility" for their services to their patients such that "their acts were not the acts of the corporation." *Id.*

Ultimately, we held the joint venture agreement was valid because EITI did not exercise the level of control over Gupta as that in *Flynn Brothers*, *Watt*, and *Rockett* such that Gupta would be considered EITI's employee:

> EITI did not have the exclusive management rights over appellant's license and did not enter into contracts with third parties for appellant to provide his medical services. Appellant and his chosen staff provided the medical services as he desired, appellant prepared the billing in the manner he chose, and then appellant provided the billing records to EITI for collection pursuant to his timetables. Appellant, however, eventually took over the billing aspect as well. EITI provided appellant with one-half the gross revenues received, but when appellant began collecting billing receipts, he did not provide gross revenue splitting as EITI had done.

> Appellant was completely independent of EITI as to diagnosis, treatment, and operation of the clinic, using his own judgment in all such matters. Appellant fixed his own fees, kept his own books, and was fully responsible to his patients for the nature and character of his services rendered to them. Under these circumstances, the parties' relationship is more that of an independent contractor and not that of an employer/employee. We hold EITI was not engaged in the corporate practice of medicine, and therefore, the joint venture agreement was valid.

11

*Gupta*, 140 S.W.3d at 755–56.

In *Fite v. Emtel*, the First Court of Appeals considered whether a nonphysician could properly serve as receiver without running afoul of the Act where a medical practice organized as a professional association was placed in receivership. 2008 WL 4427676, at *6. The *Fite* court explained that there was no statutory prohibition against appointment of a nonphysician as a receiver. *Id.* at *6–7 (discussing Texas Medical Practice Act and Texas Professional Associations Act). Further, the *Fite* court considered that the order appointing the receiver did not direct or empower him to "take any steps involving the dispensing of medical services," to employ personnel to perform medical services, or to receive any income for medical services. *Id.* at *7. Moreover, the appointed receiver understood his role as overseeing the practice's business operations, while the practice's president would handle matters concerning the practice of medicine. *Id.* Therefore, the *Fite* court held that the trial court did not err in its receiver appointment. *Id.*

McCoy and the FemPartners entities rely on *Flynn Brothers* and *Gupta* respectively and the factors of control allegedly enumerated in each. However, we do not read *Gupta*, or any other case, as providing a finite or mandatory list of factors to determine whether a certain agreement or arrangement contravenes the Act. Rather, we consider whether the summary judgment evidence, in light of the Act and prior case law and in the light most favorable to McCoy, raises a fact issue as to whether any of the FemPartners entities exercised a sufficient level of control over OGA, P.A. that such entity used the corporate fiction to circumvent the prohibition against the corporate practice of medicine. We conclude that it does not.

12

## C. The FemPartners entities established their right to summary judgment.

In their summary judgment motion, as here, the FemPartners entities argue that in circumvention-of-a-statute cases, there must be ownership by the entity sought to be charged with the liabilities of the corporation and that entity must be able to control the corporation before the veil can be pierced to reach that entity.[5] With regard to ownership, according to the FemPartners entities, none of them had any ownership interest in OGA, P.A. With regard to control, relying on *Gupta*, the FemPartners entities contend that they could not have used OGA, P.A. as a means of circumventing the Act where the service agreements expressly ensured compliance with the Act.

Under the 2001 Amended and Restated Service Agreement between FemPartners of Central Houston, L.P. and OGA, P.A., which was based on the 1997 Service Agreement between OGA, P.A. and OGA Management Partnership, the responsibilities of the parties—where "OGA" means OGA, P.A. and "MSO" means FemPartners of Central Houston, L.P.—are outlined as follows:

> 1.1. General Responsibilities of the Parties. MSO shall provide OGA with offices, facilities, equipment, supplies, non-OGA Employee support personnel, and management and financial advisory services. OGA shall pay MSO for the provision of the above described items and services as described herein. MSO shall neither exercise control over nor interfere with the physician-patient relationship, which shall be maintained strictly between the physicians of OGA and their patients. Only OGA shall practice medicine and provide medical services and shall be responsible for recruitment and hiring of physicians

---

[5] *See Delaney v. Fid. Lease Ltd.*, 526 S.W.2d 543, 546 (Tex. 1975) (three limited partners could be adjudged personally liable as general partners if took part in control of business to avoid statutory requirement of at least one general partner with general liability); *Sapphire Homes, Inc. v. Gilbert*, 426 S.W.2d 278, 283–84 (Tex. Civ. App.—Dallas 1968, writ ref'd n.r.e.) (corporate veil pierced where individual lenders used their wholly owned corporation to avoid usury laws).

and all issues related to patient care and documentation thereof.

    1.2    OGA's Matters. OGA shall maintain absolute and independent control over the diagnosis and treatment of patients and all other medical and ethical affairs of OGA. OGA shall maintain sole discretion and authority over the financial and legal matters regarding its independent corporate existence and affairs. It shall set compensation levels for OGA Employees.[6] OGA will also be responsible for all other matters pertaining to the operation of OGA, including tax planning, pension and investment planning, and expenses related solely to these internal business matters . . . .

The agreement contains the following section regarding the Act:

    1.4    Corporate Practice of Medicine. Notwithstanding any provision to the contrary contained herein, this Agreement is not intended to (a) constitute the use of a medical license or the practice of medicine by anyone other than a licensed physician; (b) aid MSO or any other corporation to practice medicine when in fact such corporation is not licensed to practice medicine; or (c) do any other act or create any other arrangements in violation of the Texas Medical Practice Act (Tex. Rev. Civ. Stat. Ann. Art. 4495b (Vernon Pamph. Supp. 1998)). MSO and OGA specifically acknowledge the following:

    1.4.1    Clinical Services. OGA shall remain entirely independent of MSO as to the diagnosis and treatment of patients and all other medical, professional and ethical affairs of OGA. OGA accepts the full responsibility to these patients for the nature and character of all professional medical services rendered.

    1.4.2    Professional Fees. OGA shall determine all fees for professional services rendered by OGA Medical Professionals.

---

[6] The agreement defines "OGA Employees" as "all Medical Professionals employed by OGA at the relevant dates." "Medical Professionals" includes physician shareholders and physician employees, as well as "Physician Extenders," or "non-physician professional employees who provide direct patient care for which a billed charge is generated."

14

1.4.3 Medical Professionals. MSO may assist OGA in recruiting of Medical Professionals. However, the selection and control of any such Medical Professionals shall be, and remain, the sole responsibility of OGA.

Jack Thompson, the President and CEO of FemPartners, Inc., testified that none of the FemPartners entities owns or ever has owned any shares, stock, or equity interest in OGA, P.A., nor did the FemPartners entities form or create OGA, P.A. Thompson stated that the FemPartners entities do not and never have had the ability to control or direct the actions of OGA, P.A. or its physicians, officers, or shareholders. Thompson indicated that the only relationship between the FemPartners entities and OGA, P.A. existed pursuant to the 1997 Service Agreement between OGA, P.A. and OGA Management Partnership and the 2001 Amended and Restated Service Agreement between OGA, P.A. and FemPartners of Central Houston, L.P. According to Thompson, under this arrangement, FemPartners of Central Houston, L.P. was to provide "business-type functions" "very similar to what an Administaff or something would do" to OGA, P.A. so the physicians of OGA, P.A. could devote their time to practicing medicine.

Dr. John Irwin, who served as President of OGA, P.A., testified that he understood the arrangement under the agreement with FemPartners of Central Houston, L.P. to allow the physicians to practice medicine while FemPartners of Central Houston, L.P. was to perform business functions, such as hiring staff, signing leases, arranging for equipment rentals and a line of credit to purchase equipment, and billing. Irwin stated that FemPartners of Central Houston, L.P. did not have a right to control the physicians' decisions on patient care. Irwin testified that the owners of OGA, P.A. were the physicians, OGA, P.A. was the employer of the physicians, and no FemPartners entity had ownership in OGA, P.A. Irwin also testified that OGA, P.A. maintained control of the diagnosis and treatment of

15

patients, while FemPartners of Central Houston, L.P. was the sole and exclusive manager of nonmedical business functions. According to Irwin, under the service agreement, OGA, P.A. completely controlled and was responsible for the hiring, compensation, supervision, evaluation, and termination of physicians.

Karen Nicolaou, CFO of OGA, P.L.L.C., testified that OGA, P.L.L.C. f/k/a OGA, P.A. was a Texas corporate entity established to employ professionals like medical doctors and that its physician members were not trying to circumvent the corporate practice of medicine.

We conclude the FemPartners entities' summary judgment evidence establishes that the FemPartners entities did not exercise sufficient control over OGA, P.A.'s medical practice such that they were using OGA, P.A. as a means to circumvent the Act. Their relationship was a business arrangement whereby FemPartners of Central Houston, L.P. would manage and administer nonmedical operations for OGA, P.A.

**D. McCoy's summary judgment evidence does not raise a fact issue.**

Because the FemPartners entities produced evidence establishing their right to summary judgment as a matter of law, we next consider whether McCoy presented evidence raising a material fact issue. *See Walker*, 924 S.W.2d at 377.

With regard to ownership of OGA, P.A. by the FemPartners entities, McCoy relies on Irwin's testimony that "old OGA" was sold to FemPartners, Inc. in October 1997. However, the record indicates that "old OGA" refers not to OGA, P.A. but rather to a different corporate entity—Obstetrical & Gynecological Associates, P.A. Moreover, McCoy fails to connect FemPartners, Inc. and OGA, P.A. through the testimony of Danguole Spakevicius, former President and CEO of FemPartners, Inc., because Spakevicius's affiliations were with FemPartners, Inc.

and Obstetrical & Gynecological Associates, P.A., not with OGA, P.A.[7] McCoy also points to a Contribution Agreement entered into in October 1997 among multiple parties, including OGA, P.A., whereby certain physicians contributed interests in New OGA, Inc. and in OGA Management Partnership to FemPartners, Inc. in exchange for FemPartners, Inc. stock. But this agreement does not indicate that any of the FemPartners entities attained any ownership interest in OGA, P.A.

McCoy relies on Irwin's testimony as evidence that FemPartners of Central Houston, L.P. allegedly exercised significant control over the physicians of OGA, P.A. For example, Irwin testified that FemPartners of Central Houston, L.P. handled the stream of physician revenues and provided physicians with their paychecks; was entitled to receive approximately 15% of the profits derived from the practice; pledged OGA, P.A.'s accounts receivable to secure debt to acquire new equipment; traded on the name of the OGA, P.A. physicians to secure payment and business arrangements with insurers and hospitals; participated in the hiring of business and medical staff, including nurses; and employed such staff. Irwin also discussed the Amended and Restated Services Agreement. Under this agreement:

- FemPartners of Central Houston, L.P. was the sole, exclusive management services agent for OGA, P.A. (section 3.1);

- FemPartners of Central Houston, L.P. would have to approve changes to restrictive covenants in physician employment contracts (section 2.3.8);

- FemPartners of Central Houston, L.P. would work to obtain and administer managed care contracts on OGA, P.A.'s behalf (section 3.1.7);

- OGA, P.A. appointed, and its physicians executed powers of

---

[7] Spakevicius testified that she was the CEO of Obstetrical & Gynecological Associates, P.A. and the founder, director, and CEO of FemPartners, Inc.

attorney for, FemPartners of Central Houston, L.P. as attorney-in-fact to perform billing, collection, deposit, and disbursement functions, including receipt of cash for accounts receivable and signing and endorsing checks (sections 3.1.8, 3.1.9, and 4.10);

- FemPartners of Central Houston, L.P. would purchase on a daily basis OGA, P.A.'s revenues and accounts receivable (section 7.4);

- OGA, P.A. provided FemPartners of Central Houston, L.P. with an irrevocable limited power of attorney with regard to banking and financial institution interactions (exhibit 7.4(c)); and

- OGA, P.A. could not acquire or affiliate with other practices without the approval of a joint operating board, consisting of OGA, P.A.'s board of directors and three FemPartners of Central Houston, L.P. representatives (section 3.3).

Even considering all this evidence in the light most favorable to McCoy, however, he does not raise a fact issue that any of the FemPartners entities had a right to or exercised a sufficient level of control over OGA, P.A.'s medical practice such that any of FemPartners entities was using OGA, P.A. to circumvent the Act. The relationship at issue between any of the FemPartners entities and OGA, P.A. falls more in line with *Fife*, *Gupta*, and *Woodson* than with *Flynn Brothers*, *Watt*, and *Rockett*. The agreement specifically provides:

12.1 Independent Contractor. It is acknowledged and agreed that OGA and MSO are at all times acting and performing hereunder as independent contractors. MSO shall neither have nor exercise any control or direction over the methods by which OGA or the OGA Employees practice medicine. The sole function of MSO hereunder is to provide all management services in a competent, efficient and satisfactory manner. . . .

The agreement also states in section 6.2 that "MSO and OGA agree that OGA, as an independent contractor, is a separate organization that retains the authority to direct the medical, professional, and ethical aspects of its medical practice." *Cf.*

18

*Olivares v. Brown & Gay Eng'g, Inc.*, 401 S.W.3d 363, 371 (Tex. App.—Houston [14th Dist.] 2013), *aff'd*, 461 S.W.3d 117 (Tex. 2015) (considering express contract language regarding nature of parties' relationship).

Moreover, control over the business operations of a corporate entity does not violate the Act. *Fite*, 2008 WL 4427676, at *7. Nothing within the Amended and Restated Service Agreement or otherwise evidences any right of or level of sufficient control with regard to the dispensing of medical services. FemPartners of Central Houston, L.P.'s contractual sole and exclusive management only reached to nonmedical functions and services. Physicians may have received their "paychecks" from FemPartners of Central Houston, L.P., but it was OGA, P.A. that set physician compensation levels and determined fees for medical services. While FemPartners of Central Houston, L.P. was involved in expansion decisions and the language of physician employment agreements, OGA, P.A. "was responsible for recruitment" of physicians, candidate interviews, and ultimate selection and control of physicians.[8] OGA, P.A. had to ensure that its physicians were properly licensed and credentialed.[9] With regard to nonbilling medical staff employed by FemPartners of Central Houston, L.P., according to Irwin, physicians were able to direct FemPartners of Central Houston, L.P. to hire a particular nurse. If a physician were dissatisfied with her assigned nurse, then FemPartners of

---

[8] Section 3.1.15 in relevant part provides: "OGA shall interview and make the ultimate decision as to the suitability of any physician to become associated with the Clinics. All physicians recruited by MSO and accepted by OGA shall be employed by or contracted with OGA, and MSO shall not employ or contract with such physicians." Section 4.2 in relevant part states: "OGA shall have complete control of and responsibility for the hiring, compensation, supervision, evaluation and termination of its Physician Shareholders and Physician Employees, although at the request of OGA, MSO shall consult with OGA regarding such matters."

[9] Section 4.1 in relevant part states: "OGA shall also ensure that any OGA Employee associated with OGA required to be licensed by the State of Texas has all required licenses, credentials, approvals, and other certifications to perform his or her duties and services for the Clinics."

19

Central Houston, L.P. would reassign or terminate that nurse.[10]

While FemPartners of Central Houston, L.P. had authority to market and negotiate managed care contracts, this authority was made subject to mandatory consultation with OGA, P.A. on all related professional and clinical matters. The powers-of-attorney requirements in the agreement, as well as the arrangements regarding billing and handling of OGA, P.A.'s revenues and accounts receivable,[11] were directed toward FemPartners of Central Houston, L.P.'s management of business financial transactions for OGA, P.A.—not decisionmaking with regard to the diagnosis and treatment of patients. While FemPartners of Central Houston, L.P. may have actually procured medical supplies, OGA, P.A. retained sole responsibility regarding oversight, supervision, and ownership of such supplies.[12]

Although FemPartners of Central Houston, L.P. was entitled to, in fact, approximately 20% of clinic distribution funds as defined by the Amended and

---

[10] Section 3.1.3 in relevant part provides: "if any Physician Shareholder is reasonably dissatisfied with the services of any of the nursing personnel assigned to such Physician Shareholder, MSO, together with OGA, will cooperate with such Physician Shareholder to reassign or terminate such employee, consistent with applicable law and risk management considerations."

[11] Section 7.4 in relevant part provides: "To assist OGA in maintaining reasonable cash flow for payment of Clinic Expenses, on a daily basis, to the extent permitted by law, MSO shall purchase the revenues and accounts receivable of OGA arising from services rendered during such day, and MSO shall obtain title to such revenues and accounts receivable simultaneously each day as the services are performed."

[12] Section 3.1.6 in relevant part provides:

MSO shall ensure that the Clinic Facilities are at all times adequately stocked with the medical supplies that are necessary and appropriate for the operation of OGA and required for the provision of medical services. The ultimate oversight, supervision and ownership of all medical supplies is and shall remain the sole responsibility of OGA. As used in this provision, the term 'medical supplies' shall mean all drugs, pharmaceuticals, products, substances, items or devices whose purchase, possession, maintenance, administration, prescription or security requires the authorization or order of a licensed health care provider or requires a permit, registration, certification or other governmental authorization held by a licensed health care provider as specified under any federal or state law.

Restated Service Agreement,[13] this constituted payment for the business management and administrative services it provided to OGA, P.A. OGA, P.A. was completely independent of FemPartners of Central Houston, L.P., and its physicians exercised their own judgment, as to patient clinical services. Further, OGA, P.A. accepted full responsibility to its patients for the nature and character of all professional medical services it rendered.

Having considered all the summary judgment evidence, we conclude there is no genuine factual dispute that the FemPartners entities used OGA, P.A. to engage in the corporate practice of medicine in contravention of the Act.

McCoy further argues that by responding to his motion for summary judgment, the FemPartners entities and the ProAssurance entities judicially admitted a fact issue existed on the veil-piercing claims. McCoy has not provided, and we have not located, any authority for the proposition that taking a position that evidence has created a fact issue in response to a motion for summary judgment amounts to a judicial admission barring a nonmovant from later arguing its entitlement to summary judgment. Moreover, statements such as "the evidence creates a fact issue" are not the sort of clear and unequivocal assertions of fact generally found to have conclusive effect.[14] Finally, the FemPartners entities' responsive pleading also contained a cross-motion for summary judgment,[15] while

_____

[13] The agreement defined clinic distribution funds as "those amounts remaining after Clinic Expenses have been deducted from Net Clinic Revenue."

[14] *See, e.g., Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001) ("Defendant accepts Plaintiff's argument that the note was accelerated by the [sic] MITC on August 15, 1994, and that the statute of limitations began to run on that date."); *Simmons v. Elmow Holdings, Inc.*, No. 2-08-027-CV, 2008 WL 2716805, at *4 (Tex. App.—Fort Worth July 10, 2008, pet. denied) (mem. op.) ("Appellant's statement that the accident occurred 'on or about May 26, 2004' is an assertion of fact in appellant's live pleadings and thus a judicial admission."); *In re G.A.G.*, No. 04-07-00243-CV, 2007 WL 3355463, at *2 (Tex. App.—San Antonio Nov. 14, 2007, no pet.) (mem. op.) (judicial admission of paternity).

[15] After the trial court denied McCoy's motion for summary judgment without ruling on

the ProAssurance entities' response argued that "at minimum" a fact issue existed. We reject this argument.

Therefore, the trial court did not err in granting summary judgment in favor of the FemPartners entities, and we overrule McCoy's first issue. Because McCoy's claims against the ProAssurance entities stem from their alleged vicarious liability for actions of the FemPartners entities, we also conclude that the trial court did not err in granting summary judgment in favor of the ProAssurance entities. We likewise overrule McCoy's second issue.[16]

### III.    CONCLUSION

Accordingly, we affirm the trial court's judgment.


/s/    Marc W. Brown
        Justice


Panel consists of Justices Christopher, Brown, and Wise.

---

the FemPartner entities' cross-motion, the FemPartners entities filed the amended motion for summary judgment at issue.

[16] Having concluded that the trial court's granting of summary judgment in favor of all the appellees was proper, we need not address McCoy's remaining arguments regarding the other potential summary judgment grounds. *See* Tex. R. App. P. 47.1.