# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00770-CV

---

**Appellant, Robert Charles Lowry, M.D. // Cross-Appellant, Texas Medical Board**

**v.**

**Appellee, Texas Medical Board // Cross-Appellee, Robert Charles Lowry, M.D.**

---

### FROM THE 459TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-006654, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant/cross-appellee Robert C. Lowry, M.D., appeals the trial court's judgment, which affirmed in part and reversed in part a final order of appellee/cross-appellant the Texas Medical Board (the Board) disciplining him for violations of the Medical Practice Act (MPA), *see* Tex. Occ. Code §§ 151.001–170.003, and related Board rules. In its cross-appeal, the Board challenges the trial court's reversal of portions of the final order. In three issues, Dr. Lowry contends that the Board could not discipline him under Occupations Code section 164.052(a)(14) and (15) for his alleged conduct. In two cross-issues, the Board contends that its discipline of Dr. Lowry under Occupations Code section 164.051(a)(3) and (6) and Administrative Code title 22, sections 165.1(a)(1) and (3) and 190.8(1)(A) and (C), was lawful and supported by substantial evidence. We affirm in part, reverse in part, and remand this proceeding to the Board.

## BACKGROUND

Dr. Lowry operated a medical clinic that diagnosed and treated patients suffering from chronic pain and concussion-related or concussion-like symptoms. Over the years, Dr. Lowry's clinic included neurologists, and patients would come to the clinic or be referred to it by other physicians because it had a neurologist. Neurology was not Dr. Lowry's area of expertise, however; he practiced "sports medicine – physical medicine & rehabilitation."

As part of his clinic's work, Dr. Lowry and others would perform or interpret patient electroencephalographs (EEGs). He did not feel fully qualified to interpret EEGs on his own, so he would often ask other physicians for help. At one point, Dr. Dennis Barson, who at the time held licenses to practice medicine in Texas and Virginia, was "the neurologist" at Dr. Lowry's clinic and saw clinic patients in person.

In February 2015, the Board suspended Dr. Barson's Texas license to practice medicine. He then ceased coming to Dr. Lowry's clinic to see patients, but he still worked with Dr. Lowry on certain issues. Dr. Lowry would call Dr. Barson to consult with him about reading patients' EEG results. Dr. Lowry felt comfortable looking for some issues on his own in patients' EEG results, but he called Dr. Barson to get help with further issues potentially shown by the results. Dr. Lowry paid Dr. Barson $100 per phone consultation. Although Dr. Lowry's clinic's patients never saw Dr. Barson after his Texas suspension, Dr. Barson's name appeared on documents in their medical records. Dr. Barson would sometimes sign "EEG Reports" appearing in patient records, including noting his Doctorate in Osteopathic Medicine.

The Board launched a disciplinary proceeding against Dr. Lowry, pursuing alleged violations of several MPA provisions and related Board rules. The Board and Dr. Lowry convened a contested-case hearing before a State Office of Administrative Hearings (SOAH)

2

administrative-law judge (ALJ), at which hearing both sides offered evidence. The Board offered exhibits and the testimony of only one witness, Dr. Randall Wright, who is a Texas-licensed physician, is board-certified, and specializes in neurology and sleep medicine. He reviewed Dr. Lowry's medical records for several patients, including two known as Patient 4 and Patient 5, and offered expert opinions.

After the hearing, the ALJ issued a Proposal for Decision, which the Board adopted nearly verbatim as its Final Order in the proceeding. In the final order, the Board issued numerous Findings of Fact and Conclusions of Law. The Board found and concluded that Dr. Lowry had violated several provisions of the MPA, including Occupations Code sections 164.051(a)(3) and (6) and 164.052(a)(14) and (15), and related Board rules, including Administrative Code title 22, sections 165.1(a)(1) and (3) and 190.8(1)(A) and (C). The Board found and concluded that Dr. Lowry associated in the practice of medicine with Dr. Barson after the latter's Texas license had been suspended, that he employed Dr. Barson after the suspension, that he failed to practice medicine in an acceptable professional manner consistent with public health and welfare, and that he violated a Board rule adopted under the MPA. Dr. Lowry moved for rehearing before the Board, but the request was denied by operation of law.

Dr. Lowry then sued for judicial review in Travis County district court. The trial court admitted into evidence all the testimony and exhibits admitted during the SOAH evidentiary hearing. After reviewing briefing from the parties, the trial court affirmed in part and reversed in part the Board's final order, reversing certain Findings of Fact and Conclusions of Law and affirming the rest. Dr. Lowry appealed the trial court's judgment, and the Board cross-appealed.

**STANDARD OF REVIEW**

The substantial-evidence standard governs Dr. Lowry's suit for judicial review of the Board's final order. *Rodriguez-Aguero v. Texas Med. Bd.*, No. 03-09-00262-CV, 2010 WL 1730023, at *8 (Tex. App.—Austin Apr. 30, 2010, no pet.) (mem. op.); *see* Tex. Gov't Code § 2001.174 (setting forth standard and providing that it applies to suits for judicial review of agency decisions when "the law does not define the scope of judicial review"); Tex. Occ. Code § 164.009 (providing for judicial review of MPA disciplinary actions without defining scope of judicial review); *Aleman v. Texas Med. Bd.*, 573 S.W.3d 796, 801 (Tex. 2019) (applying standard to review of MPA disciplinary action). Whether an administrative agency's order satisfies the substantial-evidence standard is a question of law. *Scally v. Texas State Bd. of Med. Exam'rs*, 351 S.W.3d 434, 441 (Tex. App.—Austin 2011, pet. denied) (citing *Firemen's & Policemen's Civ. Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984)). Thus, a trial court's conclusion that substantial evidence supported an agency order is not entitled to deference on appeal. *Id.* (citing *Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam)). "On appeal from the district court's judgment, the focus of the appellate court's review, as in the district court, is on the Board's decision." *Id.* (citing *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000); *Tave v. Alanis*, 109 S.W.3d 890, 893 (Tex. App.—Dallas 2003, no pet.)); *see also In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994) ("[E]ven under the substantial evidence test, we review the legal conclusions of [administrative agency] *de novo*.").

Under the substantial-evidence standard,

> a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:
>
> (1) may affirm the agency decision in whole or in part; and

4

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174. We uphold an agency finding of fact if "more than a mere scintilla" of evidence supports it. *Aleman*, 573 S.W.3d at 801. And we review an agency conclusion of law "for errors of law." *Personal Care Prods., Inc. v. Smith*, 578 S.W.3d 262, 266 (Tex. App.—Austin 2019, no pet.); *Scally*, 351 S.W.3d at 441. If the agency in its order correctly found what the relevant statutory language required it to find, then we must uphold the order. *See State Banking Bd. v. Allied Bank Marble Falls*, 748 S.W.2d 447, 448–49 (Tex. 1988) (per curiam); *Texas Health Facilities Comm'n v. Charter Med.–Dall., Inc.*, 665 S.W.2d 446, 453 (Tex. 1984).

An agency order is presumed to be valid. *Charter Med.–Dall.*, 665 S.W.2d at 453. The party challenging the agency's order bears the burden to show a lack of substantial evidence. *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988); *Charter Med.– Dall.*, 665 S.W.2d at 453. An agency order is supported by substantial evidence if the evidence in its entirety is sufficient to allow reasonable minds to have reached the conclusion that the agency must have reached to justify the disputed action. *See Sizemore*, 759 S.W.2d at 116; *Aleman v. Texas Med. Bd.*, 565 S.W.3d 26, 33 (Tex. App.—Austin 2017), *rev'd in part on other grounds*,

573 S.W.3d 796 (Tex. 2019). The evidence may even preponderate against the agency's decision yet still provide a reasonable basis for the decision and therefore amount to substantial evidence. *Charter Med.–Dall.*, 665 S.W.2d at 452. The agency is the sole judge of the weight to be accorded to the testimony of each witness. *Swate v. Texas Med. Bd.*, No. 03-15-00815-CV, 2017 WL 3902621, at *5 (Tex. App.—Austin Aug. 31, 2017, pet. denied) (mem. op.); *Central Power & Light Co. v. Public Util. Comm'n*, 36 S.W.3d 547, 561 (Tex. App.—Austin 2000, pet. denied). When weighing the evidence, the agency may accept or reject the testimony of witnesses or may accept part of a witness's testimony and disregard the rest. *Swate*, 2017 WL 3902621, at *5; *Central Power & Light*, 36 S.W.3d at 561. "The reviewing court is concerned only with the *reasonableness* of the administrative order, not its *correctness.*" *Sizemore*, 759 S.W.2d at 117 (quoting and adding emphases to *Brinkmeyer*, 662 S.W.2d at 956).

Dr. Lowry and the Board dispute the proper interpretation of provisions of the MPA. "Statutory interpretation involves questions of law that we consider de novo, even when reviewing agency decisions." *Aleman*, 573 S.W.3d at 802. "We generally 'rely on the plain meaning of a statute's words' to discern legislative intent." *Id.* (quoting *Cadena Comercial USA Corp. v. Texas Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017)). "In evaluating that language, we construe the words and phrases chosen by the Legislature in context rather than in isolation." *Id.* "That is, 'our objective is not to take definitions and mechanically tack them together,' but to 'consider the context and framework of the entire statute' and construe it as a whole." *Id.* (quoting *Cadena Comercial USA*, 518 S.W.3d at 326).

The Code Construction Act, *see* Tex. Gov't Code §§ 311.001–.035, generally applies to every provision of the Occupations Code, Tex. Occ. Code § 1.002. The Code Construction Act provides that "[w]ords and phrases shall be read in context and construed

6

according to the rules of grammar and common usage" and that "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." Tex. Gov't Code § 311.011(a), (b).

## APPLICABLE LAW OF THE MPA

Under the MPA, the Board enjoys "the power to regulate the practice of medicine." Tex. Occ. Code § 152.001(a). "A person may not practice medicine in [Texas] unless the person holds a license issued under" the MPA. *Id.* § 155.001. "Practicing medicine" means:

> the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who:
>
> > (A) publicly professes to be a physician or surgeon; or
>
> > (B) directly or indirectly charges money or other compensation for those services.

*Id.* § 151.002(a)(13).

As part of its MPA authority, the Board may discipline physicians who engage in certain statutorily prohibited practices. *See id.* § 164.051(a)(1)–(9); *Aleman*, 573 S.W.3d at 802. Among the prohibited practices referenced by Section 164.051(a)(1)[1] and listed in Section 164.052 are "directly or indirectly employ[ing] a person whose license to practice medicine has been suspended, canceled, or revoked" and "associat[ing] in the practice of medicine with a person: (A) whose license to practice medicine has been suspended, canceled, or revoked." Tex. Occ. Code § 164.052(a)(14), (15).

---

[1] Statutory references in this opinion in the form "Section [*x*]" are to sections of the Occupations Code unless otherwise noted.

7

The Board's disciplinary authority extends to a physician who "commits or attempts to commit a direct or indirect violation of a rule adopted under" the MPA. *Id.* § 164.051(a)(3). Among those rules are requirements for physician recordkeeping. Physicians must "maintain an adequate medical record for each patient that is complete, contemporaneous and legible." 22 Tex. Admin. Code § 165.1(a) (Tex. Med. Bd., Medical Records). An "'adequate medical record' should meet the following standards," among others: "(1) The documentation of each patient encounter should include: (A) reason for the encounter and relevant history, physical examination findings and prior diagnostic test results; (B) an assessment, clinical impression, or diagnosis; (C) plan for care (including discharge plan if appropriate); and (D) the date and legible identity of the observer," and "(3) The rationale for and results of diagnostic and other ancillary services should be included in the medical record." *Id.* § 165.1(a)(1), (3).

Section 164.051 also allows discipline of a physician who "fails to practice medicine in an acceptable professional manner consistent with public health and welfare." Tex. Occ. Code. § 164.051(a)(6). A Board rule clarifies what unacceptable practice may involve:

> When substantiated by credible evidence, the following acts, practices, and conduct are considered to be violations of the [MPA]. The following shall not be considered an exhaustive or exclusive listing.
>
> > (1) Practice Inconsistent with Public Health and Welfare. Failure to practice in an acceptable professional manner consistent with public health and welfare within the meaning of the Act includes, but is not limited to:
> >
> > > (A) failure to treat a patient according to the generally accepted standard of care;
> > >
> > > . . . .
> > >
> > > (C) failure to use proper diligence in one's professional practice.

22 Tex. Admin. Code § 190.8(1)(A), (C) (Tex. Med. Bd., Violation Guidelines).

8

## I. There was substantial evidence to support the Board's findings and conclusions under Section 164.052(a)(15).

Dr. Lowry's first and third issues implicate the Board's findings and conclusions under Section 164.052(a)(15)—disciplining a physician who "associates in the practice of medicine with" a person whose medical license has been suspended. In his first issue, Dr. Lowry contends that Dr. Barson was not "practicing medicine": "Dr. Barson's conduct does not satisfy the definition of the practice of medicine since he did not have contact with any patient and was used for consultation purposes only." In his third issue, Dr. Lowry contends that he was not "associating with" Dr. Barson: "there is no evidence of any association in the practice of medicine between Dr. Lowry and Dr. Barson after" the latter's Texas license was suspended.

### A. There was substantial evidence to show that Dr. Barson's actions amounted to the practice of medicine.

Under his first issue, Dr. Lowry's arguments fall into two categories— (1) Dr. Barson's "consultations" about EEG results did not amount to the practice of medicine, and (2) the practice of medicine necessarily requires patient interaction, which Dr. Barson ceased after his Texas suspension. In the "consultations" category, Dr. Lowry says that under his arrangement with Dr. Barson after the latter's Texas suspension, Dr. Lowry alone "remained solely responsible for medical decisions made on the EEG." He would pay Dr. Barson "only for the consultation and not from any patient charges." He adds that "[c]onsultation between colleagues or peers about a medical issue" does not meet the "publicly professes to be a physician" portion of the "practicing medicine" definition. *See* Tex. Occ. Code § 151.002(a)(13)(A).

In the patient-interaction category, he argues that Dr. Barson ceased practicing medicine once he ceased interacting with patients. Before the suspension, Dr. Barson saw patients

9

while physically present in the clinic, but after, he ceased coming to the clinic "and had no direct contact with any patient." Instead, Dr. Lowry argues that he simply asked Dr. Barson for advice and help in reading patients' EEG results. Finally, Dr. Lowry again raises the "publicly professes to be a physician" portion of the "practicing medicine" definition, arguing that "there is no evidence of any holding out by [Dr.] Barson either by profession to a patient or by conduct directed at a patient."

The Board responds that the phone consultations involved Dr. Barson practicing medicine because he was "determining the cause and nature of a patient's condition" as part of the phone calls. It also argues that the MPA "does not require person-to-person contact for a person to engage in the practice of medicine."

1.     *The consultations-based arguments do not remove Dr. Barson's actions from the ambit of the "practicing medicine" statutory definition.*

To discipline Dr. Lowry under Section 164.052(a)(15), the Board needed to find or conclude that he "associate[d] in the practice of medicine" with Dr. Barson after the latter's "license to practice medicine ha[d] been suspended." *See id.* § 164.052(a)(15)(A)[2]; *Allied Bank Marble Falls*, 748 S.W.2d at 448–49 (upholding agency order because agency correctly made five "ultimate findings of fact" that relevant statute required); *Charter Med.–Dall.*, 665 S.W.2d at 453 (upholding agency order because agency correctly made necessity finding required by relevant statute). To have been practicing medicine, Dr. Barson must have been "diagnos[ing], treat[ing], or offer[ing] to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or attempt[ing] to effect cures of those conditions" and either "publicly

---

[2] The Board does not raise Section 164.052(a)(15)(B)'s alternative requirement on appeal.

10

profess[ing] to be a physician or surgeon" or "directly or indirectly charg[ing] money or other compensation for those services." *See* Tex. Occ. Code § 151.002(a)(13).

The Board's evidence for Dr. Barson's having practiced medicine includes Dr. Lowry's testimony about the phone consultations. He would call Dr. Barson about EEGs so Dr. Barson could "help [Dr. Lowry] with the reads/interpretations." Dr. Lowry would ask questions like "What do you see?" and "Do you think this is what this is?" about the EEGs, and Dr. Barson would help "read" them. Dr. Barson's readings would help Dr. Lowry see patients' conditions beyond "global seizures, left/right changes that we see in concussions, and background slowing"—the conditions that Dr. Lowry said he felt comfortable assessing on his own. Dr. Lowry wanted the consultations in part because he admittedly is not "qualified to interpret all EEGs" himself. He described the experience needed to read EEGs as requiring hundreds of readings:

> [I]n 10 of them you can kind of see patterns, but you're not going to know squat. After about a hundred of them, you can pick up certain things that you're focusing on. After a couple of hundred of them, you're a little better at it. I don't think my brain is the best at it. I don't pick up patterns. . . . [S]o, you know, at this point, really, you know, I'll look them over for the basic things.

He also testified that he paid Dr. Barson $100 per consultation.

In at least two instances, Dr. Barson signed patient "EEG Reports," including noting his Doctorate in Osteopathic Medicine, made on Dr. Lowry's clinic's letterhead. In one instance, the report relayed that the patient's EEG was "mildly abnormal . . . due to the preponderance of drowsiness, most likely from medication effect"; that Dr. Barson saw "[n]o epileptiform discharges or focal asymmetries"; and that he could not "rule out the diagnosis of epilepsy" and therefore advised clinical correlation. In a second instance, the report relayed Dr. Barson and Dr. Lowry's joint conclusion that the EEG "show[ed] no evidence of epileptiform

11

activity or abnormal clinical events" but added that they could not "rule out the diagnosis of epilepsy" and therefore again advised clinical correlation.

The Board's expert witness, Dr. Wright, explained what reading EEGs entails. He explained that EEG reports must be signed by the physician who interpreted the EEG's data and that reading EEGs requires special training, usually a neurology residency plus another year of a neurophysiology fellowship. Indeed, Dr. Barson first joined Dr. Lowry because of the former's skill in neurology and signed several EEG reports that he reviewed for Dr. Lowry.

We conclude that the evidence supplied a reasonable basis for the Board's findings and conclusions that Dr. Barson was practicing medicine as part of the phone consultations, when interpreting EEGs for Dr. Lowry, and when interpreting and signing off on the EEG reports for at least three patients. *See Sizemore*, 759 S.W.2d at 116; *Aleman*, 565 S.W.3d at 33. He was helping Dr. Lowry identify the nature of certain people's conditions, as shown in their EEG results and as relayed later in the signed EEG Reports, beyond what Dr. Lowry was himself qualified to identify. This activity constitutes diagnosing physical injuries. *See* Tex. Occ. Code § 151.002(a)(13); *Methodist Hosp. v. German*, 369 S.W.3d 333, 342 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (defining Section 151.002(a)(13)'s "diagnosis": "Medical diagnosis is commonly understood to be the determination of cause and nature of a patient's condition" (citing *Loper v. Andrews*, 404 S.W.2d 300, 304–05 (Tex. 1966))). The Board could also reasonably determine from the evidence that Dr. Barson was charging money for those services, *see* Tex. Occ. Code § 151.002(a)(13)(B), because Dr. Lowry paid him $100 per phone consultation.

Dr. Lowry's arguments about the consultations do not persuade us otherwise. First, if consultations were categorically beyond the reach of the MPA, then the Legislature would not have needed to create the limited MPA consultation exemptions that it has. *See, e.g.*,

12

*id.* §§ 151.052(a)(11) (exempting certain out-of-state physicians who are "in this state for consultation with a physician"), 151.056 (subjecting telemedicine to regulation but exempting certain physicians "who provide[] only episodic consultation services" to physicians in the same medical specialty and certain physicians who are consulting for medical schools, the University of Texas M.D. Anderson Cancer Center, or the University of Texas Health Science Center at Tyler). Second, there was a reasonable basis in the evidence to show that Dr. Barson was giving Dr. Lowry advice about what medical decisions to make about certain patients, suggesting that Dr. Barson was therefore practicing medicine even if Dr. Lowry retained ultimate authority for the patients' medical treatment. After all, Dr. Lowry was calling Dr. Barson because Dr. Lowry did not feel qualified to interpret certain conditions shown on patients' EEG data on his own.

As for the source of the funds used to pay Dr. Barson, we see nothing in the statute requiring that the funds originate with patients. *See Aleman*, 573 S.W.3d at 802 (requiring interpretation of statutes consistent with the words that Legislature chose to include in statute). Dr. Barson needed only to directly or indirectly charge money or other compensation for his services. *See* Tex. Occ. Code § 151.002(a)(13)(B). And because we conclude that there was substantial evidence under Section 151.002(a)(13)(B), we need not reach Dr. Lowry's "publicly professes" arguments from Section 151.002(a)(13)(A)'s alternative requirement. In sum, we conclude that substantial evidence supports the Board's finding or conclusion that the nature of Dr. Barson's activities involved his practicing medicine.

> 2.  *Dr. Lowry's patient-interaction arguments fail because of the Legislature's structuring of the "practicing medicine" statutory definition.*

We now address Dr. Lowry's second argument, that because Dr. Barson had no more interactions with patients, he was no longer practicing medicine. We must interpret statutes

13

consistently with their overall structure, context, and framework. *See Aleman*, 573 S.W.3d at 802 ("[O]ur objective is . . . to consider the context and framework of the entire statute and construe it as a whole." (internal quotation omitted)); *Worsdale v. City of Killeen*, 578 S.W.3d 57, 69 (Tex. 2019) (rejecting interpretation that ignored statute's structure and contradicted its plain language because courts must interpret statute's plain language not in isolation but "as a whole" and "consider[ing] the context and framework of the entire statute"); *City of Houston v. Jackson*, 192 S.W.3d 764, 771 (Tex. 2006) (rejecting one party's interpretation and accepting other party's because of relevant statutes' "language and structure").

To that end, consider how the Medical Liability Act (MLA), *see* Tex. Civ. Prac. & Rem. Code §§ 74.001–.507, incorporates the MPA's "practicing medicine" definition. The MLA defines "medical care" as "any act defined as practicing medicine under Section 151.002, Occupations Code, performed or furnished, or which should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement." *Id.* § 74.001(a)(19). This MLA definition adds a patient-connection requirement to the MPA's "practicing medicine" definition. *See id.* ("for, to, or on behalf of a patient"); *CHRISTUS Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 537 (Tex. 2016) (noting that MLA applies "when the claimed injury is directly related to health care of *some* patient"); *Wilson N. Jones Mem'l Hosp. v. Ammons*, 266 S.W.3d 51, 61 (Tex. App.—Dallas 2008, pet. denied) (noting that MLA defines "medical care" "in terms of acts relating to 'patients'").

If, as Dr. Lowry argues, the MPA's "practicing medicine" definition already entails a requirement that the physician interact with a patient when performing the tasks that the statute specifies, then the Legislature would not have needed to add "for, to, or on behalf of a patient" in Civil Practice and Remedies Code section 74.001(a)(19). That requirement would

14

already exist because of the incorporation in that statute of "any act defined as practicing medicine under Section 151.002, Occupations Code." Dr. Lowry's interpretation of Section 151.002(a)(13) therefore causes some words of Civil Practice and Remedies Code section 74.001(a)(19) to become mere surplusage. We must reject such an interpretation. *See, e.g.*, *TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74 (Tex. 2016); *see also Salazar v. Dickey*, No. 04-08-00022-CV, 2010 WL 307852, at *4 (Tex. App.—San Antonio Jan. 27, 2010, pet. denied) (mem. op.) (emphasizing interpretive consequences of Legislature's inclusion in MLA's "medical care" definition of phrase "the patient's medical care, treatment, or confinement"). We thus reject Dr. Lowry's argument that by no longer interacting with patients Dr. Barson was outside of the statutory definition of "practicing medicine." Having now rejected Dr. Lowry's two categories of arguments under his first issue, we overrule that issue.

### B. There was substantial evidence to show that Dr. Lowry "associated with" Dr. Barson.

Under his third issue, Dr. Lowry's arguments depend on interpreting Section 164.052(a)(15)'s "associates in the practice of medicine with" as limited to a business-entity meaning of "associates with." He says that although the MPA does not define "associate with," it does use "association of physicians" in its definition of "health care entity": "'Health care entity' means: . . . a professional society or association of physicians . . . that follows a formal peer review process to further quality medical care or health care" or certain "organization[s] established by a professional society or association of physicians, hospitals, or both." Tex. Occ. Code § 151.002(a)(5)(C), (D). Thus, Dr. Lowry argues, courts should "apply a business entity test to the 'association'" required by Section 164.052(a)(15). He concludes that his interactions with Dr. Barson fail that test because "[t]here is no evidence that Dr. Lowry ever

practiced medicine with [Dr.] Barson by the creation of any Partnership, Professional Association, Professional Corporation, or other Professional Entity or any entity with" Dr. Barson. The Board responds that interpreting "associates with" in only a business-entity sense fails to give the term its plain and ordinary meaning. It says that courts should interpret "associates with" as "a type of prohibited act" instead of more narrowly as forming a business entity with another person.

The Board argues that we must interpret "associates with" by beginning with its plain and ordinary meaning and viewing it in its surrounding statutory context. We agree. *See* Tex. Gov't Code § 311.011(a) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage"); *Aleman*, 573 S.W.3d at 802. To that end, we note that to "associate with," as a verb with a person as its object, ordinarily means:

- "to join often in a loose relationship as a partner, fellow worker, colleague, friend, companion, or ally";

- "to come together as partners, fellow workers, colleagues, friends, companions, or allies";

- "confederacy or union for a particular purpose, good or ill".

*See Associate*, Webster's Third New International Dictionary of the English Language Unabridged 132 (2002); *Associate*, Black's Law Dictionary 121 (6th ed. 1990); *see, e.g.*, *Sunstate Equip. Co. v. Hegar*, 601 S.W.3d 685, 697 (Tex. 2020) (approving "consult[ing] dictionaries to discern the natural meaning of a common-usage term not defined by . . . statute"). These ordinary meanings involve more kinds of activity than Dr. Lowry's proposed business-entity test does. This suggests that "associating with" another means more than just forming a business entity with another.

Surrounding statutory context also suggests a more general, less technical meaning for "associates with" than Dr. Lowry proposes. Section 164.052(a)'s other subsections use

16

generally non-technical and non-legal terms like presenting a fraudulently obtained diploma, using drugs in an intemperate manner, committing unprofessional or dishonorable conduct, using false advertising, purchasing a diploma, altering a diploma, and impersonating a physician. *See* Tex. Occ. Code § 164.052(a)(1)–(13). Despite Dr. Lowry's reference to Section 151.002(a)(5)'s use of "association of physicians," the more closely contextually related portions of the statute suggest that "associates with" is not being used in a limited, technical sense like his business-entity test would require. *See Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 59 (Tex. 2015) ("As always, we are cognizant of the fundamental principle of statutory construction and indeed of language itself that words' meanings cannot be determined in isolation but must be drawn from the context in which they are used. We must therefore analyze the reasonableness of each definition in light of the statutory context. The statute's first contextual clue emerges from the words immediately surrounding 'supported.'" (internal quotation and citations omitted)); *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 441 (Tex. 2011) ("The meaning of a word that appears ambiguous when viewed in isolation may become clear when the word is analyzed in light of the terms that surround it."). Given this surrounding statutory context and the more-ordinary meanings of "associates with" discussed above, we conclude that Dr. Lowry's proposed interpretation is too narrow. We will instead apply a more commonly used meaning: to join together as partners, colleagues, friends, allies, etc. for a particular purpose.

Applying that meaning, we conclude that substantial evidence supports the Board's findings and conclusions that Dr. Lowry associated in the practice of medicine with Dr. Barson as a result of the phone consultations, Dr. Barson's interpreting EEGs for Dr. Lowry, and Dr. Barson's interpreting and signing off on EEG reports for at least three patients. The Board's evidence on this score included the phone consultations, discussed above, to get Dr. Barson's help in reading

17

patient EEGs and paying him for that help. It also included Dr. Barson's signing EEG reports showing the results of EEG interpretations, including one such report that Dr. Lowry and Dr. Barson signed together. In sum, there was substantial evidence to show that Dr. Lowry "associated with" Dr. Barson under Section 164.052(a)(15) because the two were joining together for reading and interpreting patient EEGs. *See Watt v. Texas State Bd. of Med. Exam'rs*, 303 S.W.2d 884, 884–88 (Tex. App.—Dallas 1957, writ ref'd) (affirming judgment notwithstanding verdict despite jury answer that Watt "*was not* associated in the practice of medicine with" physician whose license was suspended in part because Watt was employed by suspended physician's clinic and interpreted clinic's patients' X-rays). We overrule Dr. Lowry's third issue.[3]

## II. There was substantial evidence to support the Board's findings and conclusions under Section 164.052(a)(14).

Dr. Lowry's second issue concerns the Section 164.052(a)(14) violation—that Dr. Lowry "employed" Dr. Barson. We must review this issue because the sanctions that the Board imposed were based in part on the "aggravating factor," *see* 22 Tex. Admin. Code

---

[3] Dr. Lowry also argues that the evidence was insufficient to show that he "aided and abetted" Dr. Barson's practice of medicine because "aiding and abetting" should import intent requirements from the criminal law. Although the Board's final order did include subheadings titled "Aiding and Abetting the Unlicensed Practice of Medicine," Section 164.052(a)(14) and (15) do not require a finding of aiding and abetting, and the final order's findings and conclusions under the "aiding and abetting" subheadings cited Subsections (14) and (15) and tracked the relevant statutory terms of "associates with," "employs," and "practice of medicine." Aiding and abetting is part of a different subsection—Section 164.052(a)(17)—which the Board did not charge Dr. Lowry with violating. We do not interpret the Board's order as finding or concluding that any violation of Section 164.052(a)(17) occurred. We therefore need not resolve Dr. Lowry's aiding-and-abetting arguments. *See Ford Motor Co. v. Motor Vehicle Bd.*, 21 S.W.3d 744, 766–67 (Tex. App.—Austin 2000, pet. denied) (courts may disregard statements in agency's order as immaterial even if party challenges those statements when statements are not directly connected to any specific grant or denial of relief in agency's final order or are merely extraneous statements unnecessary to agency's order and therefore could not have prejudiced substantial rights of party).

18

§ 190.15(a)(3) (Tex. Med. Bd., Aggravating and Mitigating Factors), of Dr. Lowry's having violated more than one MPA provision. For this reason, reversing the Subsection (a)(14) violation could lead to reduced sanctions despite our having affirmed the Subsection (a)(15) violation.

In his second issue, Dr. Lowry contends that "there is no evidence that [he] employed Dr. Barson after" the latter's Texas suspension. He first argues that employment of a suspended physician requires a connection to practicing medicine to be unlawful—that hiring a suspended physician as, for example, a non-medical office manager would still be lawful. But because we have already concluded that substantial evidence supports the findings and conclusions that Dr. Barson was practicing medicine as part of his consultations for Dr. Lowry, we reject this first argument and go on to determine whether substantial evidence supported the findings and conclusions that their arrangement amounted to an employment arrangement.

Dr. Lowry argues that employment necessarily entails the employer's "right to control the activities of the employee or exercise [of] control over the activities of the employee." He concludes that Dr. Barson was not his employee because the only evidence on the issue was his own testimony and was "conclusive that there was no right of control by [Dr.] Lowry over [Dr.] Barson's activities and no exercise of control."

The Board responds by relying on evidence that Dr. Barson interpreted EEGs "in order to assist Dr. Lowry in diagnosing patients," that Dr. Barson "sign[ed] off on the EEG reports as a physician," and that he was paid by Dr. Lowry "specifically for his diagnostic services." Thus, the Board says, Dr. Lowry "made use of" Dr. Barson's services, "hired" him "as his agent or substitute in transacting business," and "commissioned and entrusted [him] with the performance of certain acts," tracking its proposed definition of "employ."

19

We are again tasked with statutory interpretation. We must interpret Section 164.052(a)(14)'s "employs," which the statute says may be either "direct[] or indirect[]" and still amount to a violation. In seeking out the plain and ordinary meaning of "employs" in its surrounding statutory context, *see* Tex. Gov't Code § 311.011(a); *Aleman*, 573 S.W.3d at 802, we turn to a longstanding body of MPA law that governs when physicians amount to employees. *See* Tex. Gov't Code § 311.011(b) ("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.").

Physicians practicing within an organization generally should be independent contractors because if they are so subject to another's control as to be an employee, then the result can be unlawful practice of medicine by a non-physician or unlawful corporate practice of medicine. *See Bodin v. Vagshenian*, 462 F.3d 481, 495 (5th Cir. 2006) (applying Texas law and noting: "In Texas, as a general proposition, physicians are not employees of hospitals or similar facilities because the corporate practice of medicine is prohibited, with limited exceptions. Physicians attend patients as independent contractors or obtain privileges to practice at a hospital or medical facility."); *Woodson v. Scott & White Hosp.*, 186 S.W.2d 720, 724–25 (Tex. App.—Austin 1945, writ ref'd w.o.m.) (holding that physician, "and his associates, under said contract were neither employe[e]s nor agents of the corporation" and that "[t]hey were more in the nature of independent contractors").

We distill a few principles from this body of law. First, the presence of an employer–employee relationship does not necessarily turn on whether the parties call the physician an "employee." *See Flynn Bros. v. First Med. Assocs.*, 715 S.W.2d 782, 785 (Tex. App.—Dallas 1986, writ ref'd n.r.e.). Next, an indicator that a physician is an independent contractor—and not an employee—is that the physician exercises independent judgment both when diagnosing

20

patients and when prescribing treatments. *See, e.g.*, *McCoy v. FemPartners, Inc.*, 484 S.W.3d 201, 210 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Gupta v. Eastern Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 756 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); *Woodson*, 186 S.W.2d at 721, 725. Similarly, because the primary goal in this area of the law is preserving the patient–physician relationship, when a physician's arrangement with an alleged employer does not affect the physician's patient relationships, the arrangement is less likely to be an employment. *See Gupta*, 140 S.W.3d at 752; *Woodson*, 186 S.W.2d at 725. By contrast, an employment arrangement existed when the employer enjoyed rights to the majority of the profits from the physician's practice, "to trade and commercialize on [physician]'s license," and to select the medical staff who would work with the physician. *See Flynn Bros.*, 715 S.W.2d at 785.

We may reverse the Board's employment findings and conclusions only if there was no reasonable basis in the evidence for them. *See Sizemore*, 759 S.W.2d at 116–17; *Charter Med.–Dall.*, 665 S.W.2d at 452; *Aleman*, 565 S.W.3d at 33. The evidence may even have preponderated against them, and we still must affirm them so long as they had a reasonable basis. *See Charter Med.–Dall.*, 665 S.W.2d at 452.

With these principles in mind, we find in the evidence reasonable support for three bases supporting the employment findings and conclusions. The first responds to Dr. Lowry's argument on appeal that he "remained solely responsible for medical decisions made on the EEG" despite Dr. Barson's consulting. Dr. Lowry testified that even after the consultations, his patients would not know about Dr. Barson's involvement, perhaps only seeing "his name on a piece of paper," because only Dr. Lowry dispensed medical care to the patients. He testified that within his area of practice he alone was responsible for his patients' care. Relatedly, EEG reports that Dr. Barson signed were on Dr. Lowry's clinic's letterhead. Dr. Barson therefore did not exercise

21

independent judgment about patient treatment and saw his treatment judgments subordinated to Dr. Lowry's, suggesting an employer–employee relationship. *See, e.g.*, *McCoy*, 484 S.W.3d at 210; *Gupta*, 140 S.W.3d at 756; *Woodson*, 186 S.W.2d at 721, 725.

Second, Dr. Barson's relationships with the patients whose EEGs he was reading were heavily affected by Dr. Lowry. Because the MPA protects physician–patient relationships, the less interference that stands between the physician's decision-making and the patient then the less likely it is that the physician is someone's employee. *See Gupta*, 140 S.W.3d at 752; *Woodson*, 186 S.W.2d at 725. Because the evidence showed that Dr. Lowry exerted ultimate and exclusive control over the patient relationships, Dr. Barson should be seen more as an employee than as an independent contractor.

Finally, Dr. Lowry testified that Dr. Barson occupied a role as "the neurologist" in Dr. Lowry's clinic while Dr. Lowry practiced "sports medicine – physical medicine & rehabilitation." His testimony suggested that his clinic would take in patients or receive referrals from other physicians because the clinic had "hired" a neurologist. The neurologist role was designed at least in part, according to Dr. Lowry, to "go[] into that area of the disease process of the brain, which [Dr. Lowry] didn't really touch." Thus, by trading on the presence of a neurologist in his clinic, Dr. Lowry was acting more in the role of an employer of Dr. Barson, as "the neurologist" for the clinic, than in an independent-contractor arrangement. *See Flynn Bros.*, 715 S.W.2d at 785 (employer-level control over physician existed in part because employer enjoyed "the right to trade and commercialize on [physician]'s license").

On the other hand, some evidence cut against the Board's employment findings and conclusions. For example, because Dr. Lowry was not qualified to read the EEGs to the degree that Dr. Barson was, Dr. Barson was likely exercising independent judgment in his diagnoses.

22

Also, Dr. Barson signed some EEG reports alone, further suggesting his independence in diagnostic judgments (but he also signed at least one report jointly with Dr. Lowry).

Even if the weight of the evidence favored a finding or conclusion of no employment, we still must uphold the Board's findings and conclusions on the reasonable bases found in the evidence. *See Sizemore*, 759 S.W.2d at 116–17; *Charter Med.–Dall.*, 665 S.W.2d at 452; *Aleman*, 565 S.W.3d at 33. We therefore hold that substantial evidence supported the findings and conclusions under Section 164.052(a)(14) and thus overrule Dr. Lowry's second issue.

## THE BOARD'S CROSS-ISSUES

### I. There was substantial evidence to support the Board's findings and conclusions under Section 164.051(a)(6), contrary to what the trial court concluded.

In its first cross-issue, the Board contends that Dr. Lowry "deviat[ed] from the standard of care and fail[ed] to use proper diligence in his medical practice." This concerns an alleged violation of Section 164.051(a)(6), which deals with "fail[ures] to practice medicine in an acceptable professional manner consistent with public health and welfare," and a related Board rule that clarifies that a "failure to treat a patient according to the generally accepted standard of care" and a "failure to use proper diligence in one's professional practice" each constitute "[f]ailure[s] to practice in an acceptable professional manner consistent with public health and welfare within the meaning of the" MPA, 22 Tex. Admin. Code § 190.8(1)(A), (C) (Tex. Med. Bd., Violation Guidelines).

The Board thus asks us to reverse the trial court's reversal of Findings of Fact 8 and 22 and Conclusions of Law 14 and 15 from the Board's final order, which say:

23

8. The standard of care for a patient presenting with pain and mental health symptoms requires a physician to explore the patient's complaint and pursue a diagnosis and treatment plan if possible.

 . . . .

22. Dr. Lowry did not evaluate Patient 5's pain management regimen in any way after the patient tested positive for opioids.

 . . . .

14. Dr. Lowry failed to follow the standard of care and failed to use proper diligence in his medical practice by failing to evaluate Patient 5's pain management regimen in any way after the patient tested positive for opioids.

15. Dr. Lowry is subject to discipline under §164.051(a)(6) of the [MPA], which authorizes the Board to take disciplinary action against a physician who fails to practice medicine in an acceptable professional manner consistent with public health and welfare. "[F]ailure to practice in an acceptable professional manner" includes: failing to treat a patient according to the generally accepted standard of care; and failing to use proper diligence [i]n one's professional practice. 22 Tex. Admin. Code §190.8(1)(A), (C).

The Board argues that it offered substantial evidence of unacceptable practice regarding Patient 5's pain-management regimen. It says that Patient 5 presented to Dr. Lowry with both neurological and psychiatric symptoms and that Dr. Lowry learned that Patient 5 was taking oxycodone. Given those facts, the Board says, the applicable medical standard of care required Dr. Lowry to pursue a diagnosis and treatment plan for Patient 5, including by evaluating the patient's pain-management regimen. The Board also relies on many excerpts from Dr. Wright's testimony.

Dr. Lowry responds that Dr. Wright never testified about the applicable medical standard of care for this issue. He notes Dr. Wright's following statement from the testimony:

I can't give you a specific standard of care statement as a practice statement. But in general as physicians, our . . . acts are . . . deemed worthy to go ahead and pursue questions that patients may have or problems they may have. So it is my duty to explore a patient's complaint. In regards to this, if a patient presents with problems of neck pain, it's my duty to go ahead and explore that. If they have conditions like

24

psychiatric conditions that I'm concerned about, then it is my duty to go ahead and pursue that some more; if not myself treating it, do a proper referral for it. So I would kind of define that as the standard of care is it is my duty to—to pursue a diagnosis and treatment plan if possible.

Dr. Lowry thus argues that Dr. Wright "never gave an opinion as to what the appropriate standard of care applied to Dr. Lowry [was] or that Dr. Lowry deviated from" it. This, he argues, left his own testimony about exceeding the standard of care as the only testimony on the matter.

When MPA discipline turns on whether a physician violated an applicable medical standard of care, the party who bears the burden of proof must offer expert evidence about the standard of care. *See Dotson v. Texas State Bd. of Med. Exam'rs*, 612 S.W.2d 921, 922–24 (Tex. 1981) (holding that no substantial evidence supported Board's decision that physicians unlawfully prescribed drugs "in a non-therapeutic manner" because Board did not have before it expert testimony that the drugs were "non-therapeutic in the manner . . . prescribed"); *Brooks v. Texas Med. Bd.*, No. 03-14-00239-CV, 2015 WL 3827327, at *4 n.4 (Tex. App.—Austin June 18, 2015, no pet.) (mem. op.) (noting that *Dotson* involved "the need for expert testimony as to what dosage . . . would have been 'non-therapeutic'" but that expert testimony is not needed when "[n]o issue of medical standard of care is present"). Here, both the Board and Dr. Lowry treat this first cross-issue as one requiring expert evidence of the applicable medical standard of care. We will therefore apply the expert-evidence requirement to the finding required by Section 164.051(a)(6) for disciplining Dr. Lowry for alleged acts and omissions about Patient 5's pain-management regimen. *Cf. Swate*, 2017 WL 3902621, at *9–12 (holding that substantial evidence supported violations of Administrative Code title 22, sections 165.1(a)(1) and 190.8(1)(A), (C), when evidence included expert testimony about applicable medical standard of care).

25

The evidence showed that Patient 5 "has episodic episodes of either syncope versus seizure" and that the patient's chief complaints were "I am not the same person I used to be," difficulty sleeping, depressed mood, mood swings, and the patient's spouse's thinking that the patient is "bipolar now." Patient 5 also had acute neck and shoulder pain. Dr. Wright reviewed Dr. Lowry's medical records for Patient 5 and testified that there was no direct evidence that Dr. Lowry's evaluation of Patient 5 addressed any of the mental-health symptoms or that he referred the patient to any mental-health professional, as Dr. Wright would have expected.

On a follow-up visit with Dr. Lowry, Patient 5 tested positive for oxycodone. Dr. Wright testified that this drug "raise[s] some concern" and is a "red flag," given Patient 5's depression, difficulty sleeping, and mood swings. But the medical records included no detailed history about Patient 5's medications, as Dr. Wright would have expected. Nor was there any sign that Dr. Lowry spoke with Patient 5 about oxycodone. According to Dr. Wright, when a patient presents with neck and shoulder pain and mental-health symptoms like depression, mood swings, trouble sleeping, and possible bipolar disorder, physicians have a duty under the applicable standard of care to "explore" the complaints; "pursue a diagnosis and treatment plan if possible"; and if not treating the complaints themselves, "do a proper referral for it." Dr. Wright believed that the applicable standard of care would "require some sort of special consult." When adding the positive oxycodone test to all this, Dr. Wright believed that such a patient requires "another level of . . . caution" and that the physician should explore "who's giving that to her" and "pursue that some more," including "do[ing] more of a medication detail." But no such detail appeared in Dr. Lowry's records, nor was there evidence of a treatment plan for additional study, as Dr. Wright would have expected.

26

Based on this evidence, we conclude that the Board did have before it expert testimony from Dr. Wright about the medical standard of care applicable to Dr. Lowry's acts and omissions regarding Patient 5 based on the patient's presentation, symptoms, and positive oxycodone test. The evidence supplied a reasonable basis for findings under both subsections (A) and (C) of Administrative Code title 22, section 190.8(1)—"failure to treat a patient according to the generally accepted standard of care" and "failure to use proper diligence in one's professional practice," respectively. The relevant provision of the Administrative Code deems those failures to be "[f]ailure[s] to practice in an acceptable professional manner consistent with public health and welfare within the meaning of the" MPA. 22 Tex. Admin. Code § 190.8(1) (Tex. Med. Bd., Violation Guidelines); *see* Tex. Occ. Code § 164.051(a)(6) (relevant provision of MPA). Dr. Lowry raises no challenge to the validity or application of these provisions of the Administrative Code. We therefore conclude that the Board had before it substantial evidence to support the finding required by Section 164.051(a)(6). *See Allied Bank Marble Falls*, 748 S.W.2d at 448–49 (agency order upheld when it contained the findings required by relevant statute, supported by sufficient evidence); *Charter Med.–Dall.*, 665 S.W.2d at 453 (same).

The trial court concluded otherwise when it reversed Findings of Fact 8 and 22 and Conclusions of Law 14 and 15. Its substantial-evidence conclusions enjoy no deference, and our focus is the agency's order and not the trial court's. *See Humphreys*, 880 S.W.2d at 404; *Scally*, 351 S.W.3d at 441. Because we conclude that the Board's findings and conclusions were supported by substantial evidence, we sustain the Board's first cross-issue and, accordingly, reverse the trial court's reversal of Findings of Fact 8 and 22 and Conclusions of Law 14 and 15.

**II.     There was substantial evidence to support a second Section 164.051(a)(6) violation and one Section 164.051(a)(3) violation but not another.**

Under its second cross-issue, the Board raises two categories of contentions: (1) Dr. Lowry failed to exercise the requisite diligence when he failed to sign or have another Texas-licensed physician sign an EEG report for Patient 4, and (2) Dr. Lowry committed MPA recordkeeping violations by failing to adequately document a plan of care for one encounter with Patient 5 and by failing to adequately document a medication list for two encounters with Patient 5. Each category involves a distinct set of alleged MPA violations and related Board rules.

**A.     *There was substantial evidence of a failure to exercise "proper diligence" in the lack of a physician signature for Patient 4's EEG report.***

This category, like the Board's first cross-issue, concerns Dr. Lowry's alleged violation of Section 164.051(a)(6) by having violated the "proper diligence" requirement of Administrative Code title 22, section 190.8(1)(C), over Patient 4's EEG report. The Board thus asks us to reverse the trial court's reversal of Conclusions of Law 13 and 15.

We have already addressed Conclusion of Law 15 under the Board's first cross-issue because its conclusion that Dr. Lowry "is subject to discipline under" Section 164.051(a)(6) is independently supported by the arguments addressed above about Patient 5's pain-management regimen. But if the Board, under this portion of its second cross-issue, is correct that substantial evidence supports a finding or conclusion that Dr. Lowry violated Section 164.051(a)(6) over Patient 4's unsigned EEG report, then that would separately support the Board's findings and conclusions of "aggravating factors" in Dr. Lowry's case. *See* 22 Tex. Admin. Code § 190.15(a)(3) (Tex. Med. Bd., Aggravating and Mitigating Factors).

Conclusion of Law 13 provided that "Dr. Lowry failed to exercise due diligence in his practice when he failed to sign, or have another Texas-licensed physician sign, Patient 4's EEG

28

report." The Board notes that Conclusions of Law 13 and 15 are supported by Findings of Fact 15 and 25, which the trial court affirmed. Those Findings of Fact say that:

> 15. EEG reports must be signed by the physician who interpreted the data. The EEG report contained in Patient 4's medical records is unsigned.
>
> . . . .
>
> 25. Dr. Lowry's medical records for Patient 4 consist of 3 pages: (1) an unsigned EEG report; (2) a document showing who the referring physician was, the patient's medical history, and a list of medications the patient is taking; and (3) billing for the EEG test.

Dr. Lowry does not challenge these findings on appeal, so we accept their facts as established. *See Madden v. State Bd. for Educator Certification*, No. 03-11-00584-CV, 2014 WL 2191927, at *4 n.4 (Tex. App.—Austin May 22, 2014, pet. denied) (mem. op.); *Helbing v. Texas Dep't of Water Res.*, 713 S.W.2d 134, 137 (Tex. App.—Austin 1986, no writ).

As for whether these facts establish a "proper diligence" violation of the relevant Board rule, both parties again treat the question as one requiring expert testimony. We will therefore review Dr. Wright's testimony for substantial evidence of the required statutory finding. *See* Tex. Occ. Code § 164.051(a)(6) (relevant MPA provision); 22 Tex. Admin. Code § 190.8(1)(C) (Tex. Med. Bd., Violation Guidelines) ("proper diligence" violation constitutes violation of relevant MPA provision); *cf. Swate*, 2017 WL 3902621, at *9–12 (holding that substantial evidence supported violations of Administrative Code title 22, sections 165.1(a)(1) and 190.8(1)(A), (C), when evidence included expert testimony about medical standard of care).

Dr. Wright testified that studies like EEG reports should always be signed by a physician as an accountability measure:

Q. And do—the EEG reports that are prepared, do they have to be signed by the physician who interpreted the data?

A. Yes, ma'am.

Q. And why is that?

A. Because you have to have someone account for what they're interpreting it as. Really any study, MRI, EEG, it's always signed by a physician, yes.

This testimony supplied substantial evidence of the applicable medical standard of care for a physician signature on Patient 4's EEG report. Because the unchallenged Findings of Fact establish that the report was not signed by a physician, substantial evidence supported a "proper diligence" violation under the applicable Board rule, which also deems such a violation to be a violation of Section 164.051(a)(6). Dr. Lowry does not challenge the validity or application of the Board rule, so we conclude that Conclusions of Law 13 and 15 were supported by substantial evidence, sustain this portion of the Board's second cross-issue, and reverse the trial court's reversal of Conclusions of Law 13 and 15.

### B. *There was substantial evidence of one recordkeeping violation regarding Patient 5 but not of another.*

This category concerns Dr. Lowry's alleged violation of Section 164.051(a)(3). That provision allows the Board to discipline a person who "commits or attempts to commit a direct or indirect violation of a rule adopted under this subtitle, either as a principal, accessory, or accomplice." Tex. Occ. Code § 164.051(a)(3). This category also concerns the Board rule that requires physicians to keep "adequate medical record[s]" that "meet the following standards," among others: "(1) The documentation of each patient encounter should include: (A) reason for the encounter and relevant history, physical examination findings and prior diagnostic test results; (B) an assessment, clinical impression, or diagnosis; (C) plan for care (including discharge plan if

appropriate); and (D) the date and legible identity of the observer," and "(3) The rationale for and results of diagnostic and other ancillary services should be included in the medical record." 22 Tex. Admin. Code § 165.1(a)(1), (3) (Tex. Med. Bd., Medical Records).

The Board asks us to reverse the trial court's reversal of Findings of Fact 30 and 31 and the second and third bullet points of Conclusion of Law 11, which say:

> 30. For Dr. Lowry's medical records for Patient 5, some of the patient encounters are missing a list of medications, and one is missing a plan of care.
>
> 31. For Patient 5, Dr. Lowry failed to adequately document a plan of care for one patient encounter, and a medication list for two patient encounters.
>
> . . . .
>
> 11. [Dr. Lowry] violated medical recordkeeping requirements generally applicable to physicians by:
>
> - [This content is intentionally omitted.];
> - Failing to adequately document a plan of care for one encounter with Patient 5; [and]
> - Failing to adequately document a medication list for two patient encounters with Patient 5.

Dr. Lowry's challenges to Finding of Fact 30 in the trial court and on appeal do not challenge the factual issue of whether the Board offered evidence that a list of medications was missing in two instances. Instead, he challenges whether the Board offered expert testimony of whether any missing lists of medications violated the applicable medical standard of care.

The parties' competing arguments require us to resolve whether expert testimony was needed to support the MPA violations at issue. The violations hinge on Dr. Lowry's not including a plan of care or a medication list, as the case may be, in the medical records for certain encounters with Patient 5. Dr. Lowry argues that Dr. Wright never testified about any applicable

medical standard of care for these violations. The Board acknowledges Dr. Wright's stated difficulty from his testimony in reaching an opinion on the applicable medical standard of care for patient recordkeeping here because some records appeared to him to be missing. But the Board counters that his lack of an opinion due to gaps in the records is itself evidence that Dr. Lowry violated recordkeeping requirements. Because Dr. Wright testified that he did not reach an expert opinion about Dr. Lowry's recordkeeping, this category turns on whether expert testimony about an applicable medical standard of care for the Section 164.051(a)(3) violations here was required.

To answer that question, we are guided by our decision in *Aleman*.[4] There, the Board disciplined a physician for his signing a paper death certificate when state law required him instead to submit it through the State Registrar's electronic process. *Aleman*, 565 S.W.3d at 28–30. Violating that law, according to the Board, constituted "unprofessional or dishonorable conduct that is likely to deceive or defraud the public" under Section 164.052(a)(5) because Section 164.053(a)(1) deems any state-law violation by a physician to be a violation of Section 164.052(a)(5) "if the act is connected with the physician's practice of medicine." *Id.* at 29, 33–34. At a contested-case hearing, the Board did not offer expert testimony of the MPA violation but still concluded that the physician violated the MPA. *Id.* at 30, 33–34. The physician argued on appeal that the lack of expert testimony, including about whether his signing the paper death certificate was "connected with [his] practice of medicine," was fatal to the Board's disciplinary findings and conclusions against him. *Id.* at 33–34. We rejected any expert-testimony requirement, reasoning that the MPA "itself defines" the conduct of violating a state law in an act sufficiently

---

[4] The expert-evidence principles from our decision in *Aleman* that we apply here were not the reasons for the later reversal in part by the Supreme Court of Texas. *See generally Aleman v. Texas Med. Bd.*, 573 S.W.3d 796, 801–07 (Tex. 2019) (affirming in part and reversing in part and explaining that reversal involved interpreting Section 164.052(a)(5), which is not at issue here).

connected with the physician's practice of medicine to be a violation of the MPA bar on "unprofessional or dishonorable conduct that is likely to deceive or defraud the public." *Id.*

Similarly here, for the violation based on the lack of a plan of care, the MPA itself provides that "a direct or indirect violation of a rule adopted under" the MPA constitutes an MPA violation. Tex. Occ. Code § 164.051(a)(3). The relevant Board rule about plans for care does not refer to any requirement involving medical judgment. Instead, the rule deems that the mere lack of a "plan for care" in a medical record makes the medical record deficient. 22 Tex. Admin. Code § 165.1(a)(1)(C) (Tex. Med. Bd., Medical Records). The evidence before the Board included Patient 5's medical records and Dr. Wright's testimony that he reviewed those records and that they were missing a plan of care for one encounter. Dr. Lowry does not challenge the validity or application of the Board rule or that a violation of that rule constitutes "violation of a rule" under Section 164.051(a)(3). Accordingly, we conclude that the Board had before it substantial evidence of a violation of Administrative Code title 22, section 165.1(a)(1)(C), which, by the terms of the MPA, amounted to a violation of Section 164.051(a)(3), even without a relevant expert opinion.

By contrast, for the violation based on the lack of a medication list for two encounters with Patient 5, the Board relies on the provisions of the relevant rule that require medical records to contain "*relevant* history" and "[t]he *rationale* for . . . diagnostic and other ancillary services." *Id.* § 165.1(a)(1)(A), (3) (emphases added). These provisions differ from the "plan for care" requirement because they implicate medical judgment: they condition violations on whether the history was "relevant" or on a physician's "rationale" for certain services. We therefore conclude that to assess what history is "relevant" for a patient and what "rationale" should be used by a physician for "diagnostic and other ancillary services," the applicable medical standard of care is implicated. *See Dotson*, 612 S.W.2d at 922–24 (assessing whether prescription

33

was "therapeutic" required expert testimony); *see, e.g.*, *Swate*, 2017 WL 3902621, at *9–11 (reviewing expert testimony in substantial-evidence review of violation of Administrative Code title 22, section 165.1(a)(1)(A) and (C)); *Scally*, 351 S.W.3d at 458 (noting, in substantial-evidence review of violation of same subsection (a) of Board rule, that "[b]oth Board experts testified that it is below the standard of care to fail to provide a diagnosis"); *Rodriguez-Aguero*, 2010 WL 1730023, at *2, 4, 8–9 (noting, in substantial-evidence review of violation of same subsection (a) of Board rule, that "the Board's expert witness . . . testified that appellant's office notes lacked documentation of [patient]'s clinical status and the medical reasons for treating [patient]'s lung mass as inflammatory instead of cancerous"). Without Dr. Wright giving an expert opinion about Dr. Lowry's recordkeeping, the MPA violation based on a lack of a medication list in two instances was unsupported by substantial evidence and prejudiced Dr. Lowry's substantial rights and therefore cannot stand. *See* Tex. Gov't Code § 2001.174(1)–(2) (courts may affirm agency order in part and may reverse only if "substantial rights of the appellant have been prejudiced"); *Aleman*, 573 S.W.3d at 806 (reversing, under Government Code § 2001.174, judgment that upheld Board order disciplining physician when Board improperly concluded that physician violated MPA). We therefore sustain in part and overrule in part the Board's second cross-issue.

As a result of our substantial-evidence review, we reach the following results under this second category of arguments under the second cross-issue. We reverse the trial court's reversal of Finding of Fact 30. We reverse the trial court's reversal of those portions of Finding of Fact 31 relating to a plan of care but affirm its reversal of those portions relating to medication lists. We reverse the trial court's reversal of the second bullet point under Conclusion of Law 11. And we affirm the trial court's reversal of the third bullet point under Conclusion of Law 11.

**RESULTS AND CONCLUSION**

The trial court reversed the following portions of the Board's final order: Findings of Fact 8, 9, 14, 22, 23, 30, and 31 and Conclusions of Law 11, second and third bullet points only; 13; 14; 15; and 16. We have reversed the trial court's reversal of Findings of Fact 8, 22, 30, and the "plan of care" portions of 31 and Conclusions of Law 11, second bullet point only; 13; 14; and 15. In its cross-appellant's brief, the Board expressly disclaims any challenge to the trial court's reversal of Findings of Fact 9, 14, and 23 and Conclusion of Law 16, so those are unaddressed by this opinion. This chart summarizes the results:

| Findings or Conclusions Reversed by Trial Court | Outcome on Appeal |
| --- | --- |
| Finding of Fact 8 | Finding reinstated |
| Finding of Fact 9 | Unaddressed by Board's cross-appeal |
| Finding of Fact 14 | Unaddressed by Board's cross-appeal |
| Finding of Fact 22 | Finding reinstated |
| Finding of Fact 23 | Unaddressed by Board's cross-appeal |
| Finding of Fact 30 | Finding reinstated |
| Finding of Fact 31 | Finding reinstated only in part |
| Conclusion of Law 11, second bullet point | Conclusion reinstated |
| Conclusion of Law 11, third bullet point | Trial court's reversal affirmed |
| Conclusion of Law 13 | Conclusion reinstated |
| Conclusion of Law 14 | Conclusion reinstated |
| Conclusion of Law 15 | Conclusion reinstated |
| Conclusion of Law 16 | Unaddressed by Board's cross-appeal |

Because of these results and the trial court's actions that were not the subject of any challenge, and because the sanctions imposed were based in part on the "aggravating factor," *see* 22 Tex. Admin.

Code § 190.15(a)(3) (Tex. Med. Bd., Aggravating and Mitigating Factors), of violations of more than one MPA provision, the Board's order is reversed in part as to the portions of Finding of Fact 31 mentioned above and as to the third bullet point of Conclusion of Law 11, the trial court's judgment is affirmed in part and reversed in part, and we remand this matter to the Board.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Kelly, and Smith
  Concurring and Dissenting Opinion by Justice Goodwin

Affirmed in Part, Reversed and Remanded in Part

Filed:   June 11, 2021